## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF VIRGINIA
## ROANOKE DIVISION

| | | |
|---|---|---|
| **BRIAN HAROLD OWENS,** | ) | |
| Petitioner, | ) | Civil Action No. 7:21cv00248 |
| | ) | |
| v. | ) | **MEMORANDUM OPINION** |
| | ) | |
| **HAROLD W. CLARKE, DIRECTOR,** | ) | By: Michael F. Urbanski |
| Respondent. | ) | **Chief United States District Judge** |

Brian Harold Owens, a Virginia inmate proceeding pro se, has filed a petition for a writ of habeas corpus, pursuant to 28 U.S.C. § 2254, challenging his 2017 convictions in Washington County Circuit Court. The respondent has filed a motion to dismiss, to which Owens has replied, making this matter ripe for decision. After reviewing the record, the court concludes that the respondent's motion must be granted, because the Virginia Supreme Court opinion addressing the habeas claims was based upon a reasonable determination of facts and a reasonable application of federal law.

### I.

On November 11, 2016, deputies from the Washington County Sheriff's Office went to a home on Whispering Pine Lane to conduct a wellness check on Patty Owens, petitioner's mother. When they arrived, petitioner Owens became belligerent and refused to let them in the home. Deputy Long attempted to contact the woman through a back window of the home, and the officers observed through the window, as Owens' "restrained" his mother, a firearm on Owens' right side. After running a criminal background check and determining that Owens had a prior conviction for felony DUI in 2005, the deputies secured an arrest warrant for possession of a firearm by a convicted felon, in violation of Virginia Code § 18.2-

308.2.  CCR[1] at 5.  Once they obtained the warrant, they forcibly entered the home and arrested Owens.

Owens was initially detained without bond.  After changing attorneys twice, Owens was finally able to get a bond set on December 27, 2016, and he posted bond on January 26, 2017.  Id. at 46.  Following a preliminary hearing on February 24, 2017, the Washington County General District Court certified the case to the grand jury.  Id. at 2.  On April 25, 2017, the grand jury returned an indictment with three charges arising out of the incident on November 11, 2016: Possession of a firearm by a convicted felon, the original charge (Va. Code § 18.2-308.2); possession of ammunition by a convicted felon, in violation of the same statute; and felony obstruction of justice in violation of Virginia Code § 18.2-460(C).  He was arrested on the additional charges on April 28, 2017, and once again was held without bond, apparently because he "resisted being served with the indicted offenses, resulting in a second standoff incident with the police." Aff. of J. Pennington, HR[2] at 660.

In May, defense counsel filed a motion to suppress the evidence, alleging an unlawful search of Owens' home in violation of the Fourth Amendment and that the subsequent arrest and search warrants were fruit of the poisonous tree.  He also filed a motion for competency and sanity evaluation of the defendant and a motion for a new bond.  CCR at 113 – 117. Following the bond hearing on May 31, 2017, the circuit court entered an order on June 1 denying Owens' request for bond.  Id. at 118.  On June 7, 2017, counsel was present with

---

[1] References to the circuit court record in Commonwealth v. Owens, No. CR17000154-00 (Roanoke Cir. Ct.), are abbreviated "CCR," followed by the page number typed in the bottom center of each page.

[2] References to the habeas record in the Supreme Court of Virginia, Owens v. Clarke, No. 200514 (Va.), are abbreviated "HR," followed by the page number in the lower left corner of each page.

Owens, in person, to withdraw the request for a competency and sanity evaluation. Id. at 178. As stated on the record on June 1, 2017, during a different hearing, Owens was "displeased with [counsel's] decision to move for competency insanity of him (sic)—mainly because it became relevant at the bond hearing as the Court's aware yesterday it was part of the ruling . . ." Id. at 217 – 218.

The court held an evidentiary hearing on the motion to suppress, at which Deputy Michael Reed testified he was dispatched at 5:58 p.m. on November 11, 2016, to the Owens home to conduct a wellness check on Patty Owens, Brian Owens' mother. The 911 dispatcher had received a call from Owens' sister saying that Owens had told her their mother was dead. Id. at 223. Reed knew both Patty and Brian previously. Upon arriving at the home, he said that Brian slammed the door in his face and told him to leave the premises if he didn't have a warrant. Reed said he heard Owens cursing inside the trailer. Deputy Long arrived to assist a few minutes after Reed arrived, and Brian asked them to come around to the back door to talk to him. Id. at 224. Lt. Turner from the Damascus Police Department arrived at that time, and they went to the back, but Owens still would not open the door. Deputy Long saw an elderly woman sitting on a couch inside the house through the back window, so Reed and Long walked to the window to try to speak to her, and Reed was able to identify her as Patty Owens. She stood up and walked towards the window, but Owens put his hand over her mouth and pushed her back to the couch. Id. at 225 – 226. Reed admitted that she did not appear injured when he saw her, but he only saw her for a split second and still wanted to talk to her before leaving. Id. at 234.

Reed returned to the front of the house, hoping that he could speak to Mrs. Owens there while Turner and Long were distracting Brian at the back of the trailer, but he was unsuccessful in making contact with her.   Then, Turner and Long came back to the front saying that they had seen a firearm holstered on Owens' right side. The officers requested more backup, and Reed asked dispatch to run Owens' information through NCIC.  He learned that Owens had a felony conviction for third offense DUI.  When other officers arrived to maintain the perimeter around the trailer, Reed left to get an arrest warrant for felon in possession of a firearm, although he had not seen the weapon himself.  Id. at 227 – 229, 238. After obtaining the arrest warrant at 7:11 p.m., he dropped the warrant off to the other officers on scene and returned to his normal patrol duties.  Id. at 229.

Deputy Chad Long testified that he arrived shortly after Deputy Reed, as he had been dispatched to meet Reed at the scene for a wellness check.  His testimony was similar to Reed's, but Long testified that he requested backup before going to the back of the trailer.  Once in the back, Long saw an elderly female standing in the middle of the room and motioned her towards the window.  As she approached, Owens put his hands on her and put her in a chair. Owens was still shouting and cursing, and hit the window, which shattered.  As Owens turned away from the window, Long saw what appeared to be the butt of a revolver in a holster on Owens' right side.  After seeing the gun, he notified his supervisor and awaited the arrival of the SWAT team.  Reed left to secure a warrant, and Long and the other officers on scene stayed behind the wall of police cars for their safety.  Over a loudspeaker, they kept urging Owens to come out of the house.  He kept coming out onto the porch yelling, clearly upset, and talking about it being Veteran's Day and asking them to leave him alone.  Although the

gun was still on Owens' side, he never made any motion to reach for it.  Long could not understand much of what Owens was saying every time he came out.  Id. at 247 – 249.

At one point, after Reed had gone to get the warrant, Owens walked the lady out to the front porch.  He left her on the porch and went back inside, shutting the door behind him.  The lady said, "You-all leave, you-all leave, everything's fine, you-all just leave."  Id. at 251.  She went back inside and sat down in the recliner.  Whenever Owens opened the door to come out or go back inside the house, Long could see the woman sitting in the recliner, watching.  Id. at 250 – 252.  On cross-examination, Long conceded that when he saw the lady, she did not appear to be injured, and that Owens asked them to leave the property several times.  Id. at 253 – 255.

Deputy Seth Sparks testified that he responded to the call for backup and arrived around 6:30 p.m.  The other officers told him what had been happening, and Sparks set up a perimeter around the trailer.  Reed left to get an arrest warrant.  They waited behind the perimeter for more backup units to arrive.  Owens kept coming in and out of the house, cussing, telling them to leave, and telling them "[L]ewd actions we could do to ourselves."  Id. at 264.  When Owens came out, Sparks noticed that he had a firearm on his right hip that looked like a Ruger Slimline pistol.  They kept asking him to remove the weapon and lie down on the ground, and he kept cussing.  Finally, the Sheriff's Response Team (SRT), their equivalent of a SWAT team, arrived on scene and entered the house, arresting Owens.  Id. at 264 – 267.  Sparks testified that he and the other deputies at the Sheriff's Office did not have body cameras, and the cars were positioned as a safety perimeter, not directly facing the house, so dashboard cameras would not have recorded the events.  Lieutenant Turner, with the

Damascus Police Department, might have had something recording, but no one else did.  Id. at 271.

After Owens' arrest, Sparks transported him for EMS medical treatment and then to the jail.  Before arriving at the jail, he was asked to bring Owens back to the scene.  He did not know why that request was made; he just followed orders.  Sparks went to speak to another officer while someone spoke to Owens, and then Sparks was told to take him on to the jail. Id. at 272 – 273.

Because Turner was present in the courtroom and might have had a body camera, based on Sparks' testimony, defense counsel called Turner as a witness.  Turner testified that he was asked to assist the Sheriff' deputies on scene.  He went to the back to speak with Owens and called his name.  Owens called Turner's name, but when Turner went up to the window, Owens cursed at him, flipped him the bird, and beat his hand on the window with the middle finger still extended.  Turner never saw Owens with a firearm.  He did not have a body camera, but his car's dashboard camera was operating.  He does not know how much the camera saw. Id. at 276 – 277.

Owens then testified on his own behalf.  He was the owner of the residence where the events occurred, and his elderly mother lived there because he was her caregiver.  When the first law enforcement officer arrived, around 5:30 p.m., Owens says he was in the middle of a phone call with one of his siblings, having a heated argument about the siblings' lack of assistance in caring for their mother.  He answered the door, and when the officer said something about a welfare check, told him everything was okay.  His mother was sitting on the loveseat about six feet behind Owens, clearly visible to the officer while the door was

6

open.  Then he asked the officer to leave, closed the door, and returned to arguing with his siblings on the phone.  The officers never asked to come in the house, nor did they ask permission to search at that time.  The only time they asked permission to search the house was when the deputy taking him to jail received a call to turn around and bring him back.  At that time, he denied consent.  He had already been treated for injuries he suffered from projectiles shot at him from 12-guage shotguns by the SRT team.  He denied holding his mother against her will, putting his hand over her mouth, or pushing her.  He did put his hands on her shoulders to help direct her back to the loveseat so she could sit back down, because she was upset.  He acknowledged that he asked Lt. Turner (and only Lt. Turner) to come to the back of the house to speak with him.  Lt. Turner was from "local" law enforcement, in a town where everyone knew everyone, and since the county sheriff's deputies would not leave, he thought he would ask Turner if he could get the officers out of there.  Id. at 280 – 287.

On cross-examination, Owens stated that Veteran's Day was an important day to him, because he was an honorably discharged disabled veteran himself, having served four years in the Army (1990 – 1994), including time in Iraq.  He denied being angry, but said he was frustrated.  His sister and another sibling both called that afternoon, and he was still on the phone with them while trying to deal with the deputies.  He denied telling his sister that his mother was dead.  His frustration was that they did not assist in her care but regularly called to tell him what he should be doing for mom and when.  He admitted that he broke the back window, but said it was an accident, noting that the mobile home windows were thin, single-pane glass that broke too easily.  He admitted throwing his dress uniform, with medals, onto

the lawn, because he felt disrespected by the officers in his yard pointing AR15s at him, and he asked them what he had fought for if they treated him that way.  Finally, he denied that he had possessed a weapon or holster that day, though he acknowledged that his mother owned a small black automatic pistol.  Id. at 287 – 301.

At the request of the defense, the court left the record open for a few days and directed the Commonwealth Attorney to look for and provide any video from the officers' dash cameras and all relevant recorded dispatch communication from November 11, 2016.  Id. at 303.  When the parties reconvened on June 5, 2017, the Commonwealth Attorney represented that there was no dash camera video that captured the event, and the actual dispatch recording had been recorded over, leaving only the written documentation of the 911 call.  The Commonwealth also called Master Deputy Brandon McPherson, from the SRT team that arrested Owens.  McPherson testified that he and other officers tried to get Owens to come out of the house voluntarily.  Owens came out a few times, but only halfway out the door. One of the officers hollered about the gun on him, and Owens replied that it was just a BB gun.  The last time Owens came out, they shot bean bags at him from 12-guage shotguns, hoping to disable him temporarily so that they could arrest him outside, but Owens retreated into the house and did not come back out.  Eventually, the decision was made to go into the trailer and arrest him.  The team broke into the back door of the trailer, and one of the officers tasered Owens while another wrestled him to the ground and arrested him.  He was not wearing a holster at that point. Another officer found a firearm on the couch.  Id. at 427 – 423.

After considering the evidence and arguments of counsel, the trial court denied the motion to suppress in an order entered June 8, 2017, finding that the emergency/community caretaking exception justified the officers' presence on the property, and the events that transpired thereafter could properly be the basis of the arrest and search warrants.  Id. at 180.

Following the trial court's decision denying the motion to suppress, on June 14, 2017, Owens decided to enter an Alford plea[3] to all charges, without benefit of a plea agreement, rather than risk proceeding with the jury trial scheduled for that day.  Prior to the hearing, he completed the "Guilty Plea Questionnaire," regarding his understanding of the charges against him, potential penalties, and satisfaction with his attorney, among other items.  Id. at 310 – 311.  Before accepting his plea, the court asked him under oath in open court if he had completed the questionnaire, understood the questions, and answered truthfully.  The court asked if he had time to discuss any defenses with his lawyer and reiterated the potential maximum penalty of twenty years on the three charges combined.  The court then accepted his plea and ordered a presentence report.  Id. at 396 – 408.

On October 4, 2017, a different judge presided over the sentencing hearing.  Owens took the stand briefly to explain what he considered the mitigating background information to the situation, summarizing his testimony from the suppression hearing.  After hearing the evidence and arguments of counsel, the court sentenced Owens to five years on each charge (plus a $500 fine on each) for a total sentence of fifteen years.  He suspended all five years on

---

[3] An Alford plea is named after Alford v. North Carolina, 400 U.S. 25 (1970), the case upholding the constitutionality of a court accepting a plea from a person who does not admit committing the crime, but who believes the evidence would be sufficient to support a conviction and does not wish to risk a trial.

the ammunition charge and three years on the obstruction charge, leaving Owens with seven years to serve.  Id. at 367 – 368.

Three days after the sentence hearing, counsel received a letter from Owens asking him to withdraw and stating that he wished to appeal.  He further alleged that his Alford plea had been entered under duress.  Id. at 326.  Counsel promptly filed a motion to withdraw the next day, advising the court of the circumstances.  Id. at 322 – 323.  New counsel was appointed for Owens and promptly filed a motion to withdraw Owens' plea and grant a new trial on November 6, 2017.  Id. at 334 – 335.  The trial court entered judgment on the sentencing order on November 8, 2017, before the hearing on Owen's motion to withdraw his plea.  Id. at 336 – 337.

On November 16, 2017, Owens testified at the hearing to withdraw his plea.  First, he testified that he had been offered a plea agreement for one year in prison.  Id. at 378.  A copy of that agreement is in the court's file, reflecting an offer to plead guilty to a single charge, possession of a firearm by a felon, with a sentence of five years, four suspended, such that he would only have to serve one year in custody and then two years of supervised probation.  Id. at 327 – 329.  Owens testified that he rejected the plea agreement because "my previous attorney . . . and I were under an agreement that we were going to go to trial on the charges that were brought against me and we were going to win my case."  Id. at 379.  He further testified that his attorney never advised him that he should take the agreement and never discussed risks and benefits of taking the plea versus going to trial.  Up until the morning of trial, June 14, 2017, Owens understood from talking to his attorney that they would win the

trial.  That morning, however, his attorney told him, "I can't win.  We're not going to win."  Id. at 380.

Owens said he was in shock about his attorney's sudden change in attitude, and he felt coerced into taking the Alford plea.  His attorney told him that the court would probably sentence him to two years, three at the most.  He signed the guilty plea questionnaire, which had already been filled for him, and all he had to do was sign.  He did not read the questions, because he was still in shock.  He remembers that the judge asked him questions before accepting the plea, but he does not remember exactly what he was asked or what he said in response, because he was numb.  He also confirmed that he understood he could get more time at a new trial than the court had sentenced him to, but he wanted to exercise his right to a trial.  Id. at 380 – 391.  The court indicated that ruling would be forthcoming by letter.

In the meantime, Owens filed a timely appeal from the judgment order entered November 8, 2017.  The trial court subsequently denied Owens' motion for a new trial, issuing a letter on January 3, 2018, followed by a formal order on January 10, 2018.  Id. at 421, 500.  In his petition for appeal, the sole issue Owens raised was that the trial court erred in denying his motion to withdraw his plea.  By per curiam opinion, the Court of Appeals of Virginia dismissed the appeal on the grounds that the trial court did not rule on the motion within 21 days of entry of the judgment order; therefore, the trial court's order of January 10, 2018, was void for lack of jurisdiction, and there was nothing for the appellate court to review.  Owens v. Commonwealth, No. 2000-17-3 (Va. Ct. App. July 26, 2018).  A three-judge panel of the court agreed, dismissing Owens' application for consideration by the panel on October 4, 2018.  The Supreme Court of Virginia also refused Owens' petition for appeal.  Owens v.

Commonwealth, No. 181432 (Va. May 22, 2019).  Owens did not file a petition with the United States Supreme Court.

Owens filed a state petition for habeas corpus in the Supreme Court of Virginia on or about April 4, 2020.  He alleged (1) ineffective assistance of trial counsel for failing to obtain an evaluation of his mental capacity to stand trial and coercing him to enter a guilty plea by telling him that they could not win and that Owens would "get a lot of time" at sentencing; (2) violation of his Fourth Amendment rights by the trial court by denying his motion to suppress, accompanied by ineffective assistance of trial counsel in failing to obtain video of the incident from dash camera or body camera videos before the evidence was recorded over; and (3) ineffective assistance of appellate counsel in failing to raise the ineffective assistance of trial counsel on appeal.  The court found neither deficient performance nor prejudice on any of the ineffective assistance of counsel claims; the court further held that Owens' guilty plea waived all non-jurisdictional defenses that pre-existed the plea.  The court accordingly dismissed the state habeas petition.  Owens v. Clarke, No. 200514 (Va. Feb. 25, 2021).

Owens timely filed the current § 2254 petition on or about April 29, 2021, raising the following issues:

1. Ineffective assistance of counsel when trial counsel did not arrange for evaluation and expert testimony by an independent psychologist or psychiatrist during the trial phase or sentencing phase of defendant's trial.

2. Illegal search and seizure in violation of the Fourth Amendment, facilitated by trial counsel's ineffective failure to procure video evidence from the officers' body

cameras and/or dashboard cameras that would have impeached their testimony at the motion to suppress.

3. Ineffective assistance of appellate counsel for not pursuing Owens' claim of ineffective assistance of trial counsel.

Because Owens raised each of the above issues on its merits in the state habeas petition, he has properly exhausted his state remedies.

## II.

A federal court may grant a petitioner habeas relief from a state court judgment if the petitioner is in custody in violation of the Constitution, laws, or treaties of the United States. 28 U.S.C. § 2254(a). However, federal courts reviewing claims that have been adjudicated on the merits in the state court may grant relief on such a claim only if the state court's decision was (1) "contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States," or (2) "was based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding." 28 U.S.C. § 2254(d)(1)-(2). When reviewing a claim of ineffective assistance of counsel, courts also apply a highly deferential standard. A petitioner must show that (1) counsel's performance was so deficient that he was not functioning as counsel guaranteed by the Sixth Amendment <u>and</u> (2) that the deficient performance prejudiced the defense. <u>Strickland v. Washington</u>, 466 U.S. 668, 687 (1984). When reviewing a state court's assessment of an ineffective assistance of counsel claim, federal review is "doubly deferential," because the deferential standard of review under the statute overlaps with the deferential standard under <u>Strickland</u>. <u>Cullen v. Pinholster</u>, 563 U.S. 170, 190 (2011). In other words, the federal

court is to afford "both the state court and the defense attorney the benefit of the doubt." Burt v. Titlow, 571 U.S. 12, 15 (2013).

Deficient performance requires a showing that counsel's performance fell below "an objective standard of reasonableness . . . under prevailing professional norms." Strickland, 466 U.S. at 688.  The reviewing court must not rely upon "the distorting effects of hindsight," but must presume that counsel's decisions and actions fell within the wide range of reasonable strategy decisions.  Id. at 689–90.  To establish prejudice under Strickland, Owens must show that there was "a reasonable probability that the outcome of the proceedings would have been different," which means a probability sufficient to undermine confidence in the outcome." Id. at 694.

Using the standard of review required by § 2254(a) and the criteria in Strickland, the court will address each of Owens' claims.

## A.  Failure to Obtain a Psychological Evaluation

Owens alleges that counsel knew that Owens was being treated for anxiety and depression at a Veteran's Administration Hospital in Tennessee and that Owens was being treated with anti-psychotic medication (which he was not taking regularly) by a psychiatrist at the Southwest Virginia Regional Jail.  Based on this, he asserts that counsel was ineffective for failing to obtain an evaluation of Owens' competence to stand trial.  The state habeas court held that Owens failed to establish either deficient performance of counsel or prejudice.

In support of its decision, the state court made the following factual determinations: (1) That counsel did file a motion for evaluation of sanity and competence; (2) that counsel withdrew the motion because Owens was "displeased with [counsel's] decision" to seek the

competency evaluation; and (3) that Owens conduct and testimony throughout all court proceedings demonstrated his competence and ability to assist counsel. Owens v. Clarke at *2–3. Based on the record, these factual findings are not unreasonable. The circuit court record contains a motion for psychological evaluation filed by counsel. CCR at 113 – 114. The transcript of proceedings reflects that counsel withdrew the motion, in the presence of Owens, because Owens was "displeased with [counsel's] decision" to raise the issue. CCR at 178, 217 – 218. The record further reflects that Owens answered questions from the court in a logical, coherent manner, supporting a factual finding that his conduct demonstrated competence.

The state habeas decision was not contrary to, nor an unreasonable application of, federal law. Mental illness is not equivalent to incompetence. Mental illness covers a wide range of conditions that affect a person's thinking, feeling, mood, or behavior, but these conditions do not necessarily render a person incompetent. Incompetence is the inability to understand the charges and the present inability to assist counsel. Dusky v. United States, 362 U.S. 402, 402 (1960); Burket v. Angelone, 208 F.3d 172, 192 (4th Cir. 2000) ("Not every manifestation of mental illness demonstrates incompetence to stand trial."). When counsel reasonably believed that Owens would be found competent, then there was no deficient performance in failing to have him evaluated. This is all the more reasonable because Owens did not wish to challenge his competency. As the government asserts, when a defendant, "fully informed of the reasonable options before him, agrees to follow a particular strategy at trial, that strategy cannot later form the basis of ineffective assistance of counsel." United States v. Weaver, 882 F.2d 1128, 1140 (7th Cir. 1989). Here, the record establishes that Owens

did more than agree with counsel's decision to withdraw the competency motion; he affirmatively asked counsel to do so.

Likewise, the state habeas court reasonably decided that Owens suffered no prejudice from counsel's failure to persist in the competence evaluation.  Owens has not offered any evidence to establish that he was not competent or sane, and the burden of proving incompetence or insanity is on the criminal defendant.  Burkett, 208 F.3d at 192.  Without such proof, there is no reasonable likelihood of a different result if counsel persisted in the evaluation despite Owens' objections.

Because the state habeas court's decision is reasonable on both the facts and the application of federal law, the federal court must deny this claim.

## B.  Denial of Fourth Amendment Rights

### 1.  Constitutional Claim

If a state prisoner had the opportunity for full and fair litigation of a Fourth Amendment claim, he is not entitled to federal habeas relief on the ground that the evidence obtained in an unconstitutional search or seizure was introduced at his trial.  Stone v. Powell, 428 U.S. 465, 494 (1986).  This is because the social costs of the exclusionary rule are high. Id. at 490.  The evidence that a defendant seeks to exclude is usually reliable and is often the most compelling evidence of guilt.  Id.  Application of the exclusionary rule cripples the "truthfinding process" and sometimes allows the guilty to go free.  Id.  Despite these costs, the Supreme Court and others have found it necessary for society to pay this cost to deter police misconduct and promote respect for Fourth Amendment values.  Id. at 490–91.  Once a defendant has had the opportunity to raise his Fourth Amendment challenges before a trial

court and at least one appellate court, however, there is little deterrent benefit in allowing further litigation of the issue, and even less benefit to reversing a conviction because evidence is suddenly deemed inadmissible, even though prior courts had the opportunity to consider the constitutionality of the search from which evidence was obtained. Id. at 491. The decreasing deterrent value of continued efforts to exclude evidence no longer outweighs the social costs of the exclusionary rule when a case has reached this stage. Id. at 491–93. The decision in Stone applies whether or not a defendant took advantage of the opportunity to litigate his Fourth Amendment claim. Graham v. Costello, 299 F.3d 129, 134 (2nd Cir. 2002); cf. Doleman v. Muncy, 579 F.2d 1258, 1265 (4th Cir. 1978) (recognizing that Virginia's statutes provide a mechanism for filing motions to suppress evidence and to assign adverse rulings as error on appeal, thereby providing defendants the opportunity to raise Fourth Amendment claims).

Owens had the opportunity to litigate his Fourth Amendment claim. He exercised that opportunity by filing a motion to suppress in the trial court. After he failed to prevail on the motion, he chose to enter an Alford plea, thereby waiving his right to appeal the trial court's decision. That choice does not constitute an impairment of his right to litigate his claim; rather, it represents the strategic choice that he made. The state habeas court held that a voluntary and intelligent guilty plea waives all non-jurisdictional defenses that preceded the plea. This is in complete accord with federal law. The Supreme Court has stated that:

> [A] guilty plea represents a break in the chain of events which has preceded it in the criminal process. When a criminal defendant has solemnly admitted in open court that he is in fact guilty of the offense with which he is charged, he may not thereafter raise independent claims relating to the deprivation of constitutional rights that occurred prior to the entry of the guilty plea.

17

Tollett v. Henderson, 411 U.S. 258, 267 (1973).

Because Owens had the opportunity to raise his Fourth Amendment in state court and because his guilty plea broke the chain of events in the criminal proceeding, his Fourth Amendment claim is not cognizable in federal court, and this claim must be dismissed.

### 2. Ineffective Assistance of Counsel Claim

Owens alleges that counsel was ineffective in presenting the Fourth Amendment challenge to the trial court because counsel did not timely investigate, locate, and subpoena exculpatory evidence, including police body cameras and dashboard cameras, that would have "exonerated Owens," apparently by showing that Owens did not have a firearm. To show deficient performance, Owens must show that counsel's performance fell below "an objective standard of reasonableness . . . under prevailing professional norms." Strickland, 466 U.S. at 688. As Owens presents his claim, he seems to suggest that counsel never asked about video recordings before the suppression hearing, but a review of the record establishes what counsel did in preparing for the case, once he was representing Owens.[4] Counsel successfully, got bond set for Owens (CCR at 35); met with the Commonwealth Attorney to review the file and discuss the case, before the preliminary hearing and before the suppression hearing (HR at 659); inquired about the existence of video camera recordings (id.); spoke with the law enforcement officers involved, filed a motion for discovery and exculpatory evidence in Circuit Court within one month of the probable cause hearing (CCR at 59-61); and asked the

---

[4] As of November 14, 2016, three days after Owens' arrest, he was represented by Kimberly Haugh. An order of substitution endorsed by counsel reached the court on November 23, 2016, substituting Chip Barker as attorney for Owens. The attorney who represented Owens at the suppression hearing and at trial is first mentioned in court files on December 20, 2016, when he scheduled a bond hearing for Owens for December 27, 2016. CCR at 34.

investigators at the suppression hearing whether they were wearing body cameras and whether their vehicle dashboard cameras were operating.

Owens asserts that counsel should have requested a subpoena for the video recordings, and he should have done so before the video was recorded over.  By all accounts, however, none of the deputies had a body camera; the Sheriff's Office did not provide them to its officers at that time (CCR at 271).  Undoubtedly, when counsel asked the Commonwealth Attorney and the investigators about any such recordings, he was told that the Washington County Sheriff's Office did not wear body cameras.  There is nothing unreasonable in failing to request a subpoena for something that does not exist, as the Supreme Court of Virginia stated in its habeas opinion.  Further, Rule 3A:12(b) of the Rules of the Supreme Court of Virginia require counsel to certify, in writing, that an item being requested is material to the proceedings before the court will issue such a subpoena; counsel would be walking a thin ethical line to make such a certification when he was already told that no body cameras existed.

One police officer (not from the investigating Sheriff's office, but from the town police department) testified that his dashboard camera had been on that night, but he didn't know what, if anything, had been captured on film.  Unfortunately, that had been "looped over" or recorded over in the normal course of business.  Owens seems to suggest that a subpoena would have prevented this.  However, Owens fails to consider that the videotape from Lt. Turner's vehicle may have been recorded over before his attorney was involved in the case. Retention policies vary widely from one police department to another, with some requiring retention for as few as 30 days and others not requiring retention of dash camera video footage.  See Brennan Center for Justice, Police Body Camera Policies: Retention and Release

(Aug. 3, 2016), https://www.brennancenter.org/our-work/research-reports/police-body-camera-policies-retention-and-release (retrieved March 15, 2022).

Owens has failed to show any reasonable action that counsel failed to take, and the state habeas court's decision is fully supported by the record and the law.

Additionally, Owens cannot show prejudice from the failure to view Lt. Turner's dash cam video. The officers testified that the cars were parked around the trailer as a shield, not facing Owens' home. One can only speculate what, if anything, was captured by a dashboard video camera under those circumstances. Speculation is not sufficient to meet Owens' burden of proving that, absence counsel's conduct, the outcome would have been different, especially when the testimony of several different officers described in detail their observations that night. See United States v. Matthews, 373 F. Appx. 386, 2010WL1452617 at *4 (noting that the "court found the three detectives were credible and made the factual finding that there was 'nothing' to suggest the video would show anything[else]).

The state habeas court held that Owens failed to establish either deficient performance or prejudice in counsel's investigation of the case and handling of the motion to suppress, and because the court's findings and conclusions of law are both reasonable, the court must dismiss this claim.

### C. Ineffective Assistance of Appellate Counsel

Owens alleges that appellate counsel was ineffective in failing to raise the ineffective assistance of trial counsel issues in the direct appeal. The state habeas court found that counsel's performance was not deficient, because choosing which issues to raise on appeal is within the discretion of the attorney. The court's decision is a reasonable and correct

application of federal law.  See Jones v. Barnes, 463 U.S. 745, 751 (1983) (holding that the Constitution does not give a defendant the right to compel counsel to raise every nonfrivolous issue he wishes, if counsel decides, "as a matter of professional judgment," not to raise those points).

Further, as the state habeas court noted, in Virginia claims of ineffective assistance of counsel may not be considered on direct appeal.  Dowdy v. Commonwealth, 278 Va. 577, 591, 686 S.E.2d 710, 717 (2009); Johnson v. Commonwealth, 259 Va. 654, 675, 529 S.E.2d 769, 781 (2000).  If appellate counsel had raised ineffective assistance of counsel on appeal, the appellate court would not have considered the issue on the merits at that time.  Accordingly, Owens could not have suffered any prejudice from counsel's failure to raise ineffective assistance of counsel in the wrong stage of the proceedings.

The state court's decision that appellate counsel's performance was not deficient, and that Owens was not prejudiced, was a reasonable decision.  Accordingly, a federal court may not grant relief on this claim, and the court will dismiss it.

### III.

For the reasons stated, the state court decisions in this matter are based upon a reasonable determination of facts and a reasonable application of federal law.  Accordingly, the respondent's motion to dismiss must be granted.

When issuing a final order adverse to a § 2254 petitioner, the court must issue or deny a certificate of appealability.  Fed. R. Gov. § 2254 Cases 11(a).  A certificate of appealability may issue only if the movant has made a substantial showing of the denial of a constitutional right.  28 U.S.C. § 2253(c)(2).  The movant must show that reasonable jurists could debate

whether the petition should have been resolved in a different manner or that the issues presented were adequate to deserve encouragement to proceed further.  Miller-El v. Cockrell, 537 U.S. 322, 338 (2003); Slack v. McDaniel, 529 U.S. 473, 483–84 (2000).  Owens has not made such showings in this case.

For the foregoing reasons, the court will grant respondent's motion to dismiss, dismiss the petition for a writ of habeas corpus, and deny a certificate of appealability.

**ENTER:** This 22nd day of March, 2022.

Michael F. Urbanski
Chief U.S. District Judge
2022.03.22 18:46:46
-04'00'

_____
Michael F. Urbanski
Chief United States District Judge